IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 25, 2025 Session

## SHAUN CHRISTOPHER BRUCE ET AL. v. TENNESSEE AMERICAN WATER COMPANY

**Appeal from the Circuit Court for Hamilton County**
No. 19C1051  John B. Bennett, Judge

_____

**No. E2024-00933-COA-R3-CV**

_____

This is an appeal from the denial of two class action certifications. The trial court found that the classes proposed by the Appellants did not meet the requirements of Tennessee Rule of Civil Procedure 23. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

VALERIE L. SMITH, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Lee Davis and Van Bunch, Chattanooga, Tennessee, for the appellants, Shaun Christopher Bruce, Bonnie L. Schafer, and Trinity Entertainment, LLC.

Joe A. Conner, Ryan A. Freeman, and Adam C. Sanders, Chattanooga, Tennessee, for the appellee, Tennessee-American Water Company, d/b/a Tennessee American Water.

**OPINION**

## I.  FACTUAL BACKGROUND

This case arises from a September 2019 water service interruption and precautionary boil water advisory affecting customers of the Tennessee American Water Company ("TAW") in Chattanooga, Tennessee (the "Water Loss Incident"). On the evening of September 12, 2019, a contractor performing maintenance at TAW's water treatment plant struck a thirty-six-inch main line, which resulted in a loss of water pressure throughout parts of the distribution system. TAW isolated the break and completed repairs in the early morning hours of September 14, 2019. As a result of the break, TAW issued a precautionary boil water advisory on September 13, 2019, after consultation with the

Tennessee Department of Environment and Conversation. Although further testing showed that water quality met safety standards, the advisory remained in effect in certain service zones until September 16, 2019. Approximately 35,000 customers experienced temporary service loss or reduced water pressure during the incident, while others remained unaffected.

On September 17, 2019, Plaintiffs Shaun Christopher Bruce, Robert Kelley, and Trinity Entertainment, LLC, (the "initial Plaintiffs") on behalf of themselves and others similarly situated, filed a class action complaint in the Hamilton County Circuit Court. The complaint named as defendants TAW, American Water Works Company, Inc., and American Water Works Service Company, Inc. The initial Plaintiffs asserted claims for negligence and breach of contract. The initial Plaintiffs sought to represent the following class of individuals and businesses:

> All persons and businesses who lost water service provided by Tennessee-American Water Company during the Water Loss Incident, or who suffered monetary losses as the result of not being able to earn wages during the Water Loss Incident.

The initial Plaintiffs alleged that TAW failed to provide "safe and adequate drinking water" and breached its contract by failing to supply potable tap water to approximately 35,000 connections during the September 2019 Water Loss Incident.

TAW's contract with its customers (the "Tariff"[1]) is augmented by the Tennessee Public Utility Commission ("TPUC") regulations requiring the company to provide "reasonably adequate and safe service." TPUC reviews TAW's Tariff as well as promulgates rules and regulations applicable to water companies pursuant to Tennessee Compilation of Rules and Regulations section 1220-04-03-.03, *et seq*.

The Tariff provides, in relevant part, that:

> The Company[2] will undertake to use reasonable care and diligence to prevent and avoid interruptions and fluctuations in Water Service and to maintain reasonable pressure on the distribution system, but it cannot and does not guarantee to furnish at all times any given quantity for fire or general purposes or that interruptions or fluctuations in service will not occur. In the event there occurs any excess or deficiency in the pressure, volume or supply of water for any cause whatsoever, other than willful default or neglect on

---

[1] "Tariff" as used throughout this Opinion refers to the contract obligations owed by TAW to the water service customers, which is regulated by the Tennessee Public Utility Commission.

[2] "The Company" as mentioned throughout the Tariff refers to TAW.

the part of the Company, the Company shall not in any way or under any circumstances be held liable or responsible to any person, firm, corporation or Governmental Unit for any resulting loss or damage.

Unless due to willful default or neglect on the part of the Company, the Company shall not be liable for any damages resulting from the breaking of mains or Service Pipes, interruption of the supply of water or cutting off water for necessary repairs or maintenance, or from any other act omission or event.

The trial court acknowledged, and the parties did not dispute, that the applicable TPUC regulations augment and are part of TAW's Tariff.

As a result of the Water Loss Incident, the initial Plaintiffs sought economic damages, out-of-pocket expenses, and inconvenience damages on behalf of residential and business customers as well as hourly wage earners of the businesses closed during the interruption in water service. The initial Plaintiffs later substituted Bonnie L. Schafer for plaintiff Robert Kelley by order of the trial court. Thus, the named Plaintiffs consisted of Shaun Christopher Bruce, Bonnie L. Schafer, and Trinity Entertainment, LLC (the "Appellants").

On September 18, 2020, the trial court dismissed the Appellants' claim for negligence under the economic loss doctrine, which left only the breach of contract claim to proceed. On September 25, 2020, the trial court entered an agreed order voluntarily dismissing the two American Water Works entities without prejudice, rendering TAW as the sole defendant.[3]

On July 27, 2022, approximately three years after the lawsuit began, the Appellants filed a motion seeking class certification pursuant to Rule 23 of the Tennessee Rules of Civil Procedure. In the Appellants' memorandum in support of the motion for class certification, the Appellants proposed a second, broader definition compared to the definition in its complaint. The Appellants sought certification of a class consisting of:

[A]ll of TAW's residential and business customers in the Chattanooga Service Area (as shown in the distribution map attached Exhibit 24) at the time of the Water Loss Incident, and all non-customer employees of TAW's business customers in the Chattanooga Service Area who were unable to earn hourly wages during the Water Loss Incident.

TAW filed its response on September 16, 2022, and the Appellants filed a reply on October

---

[3] The American Water Works entities did not make further appearance after the agreed order dismissing the parties without prejudice was entered and the entities are not a party to this appeal.

7, 2022. A hearing on class certification was held on January 12, 2023.

The trial court denied class certification after determining that the Tariff, as augmented by the applicable regulations, required the Appellants to prove two things. First, the existence of an unreasonable interruption in service, or a failure to provide adequate service, to customers. Second, the unreasonable interruption or failure to provide adequate service was attributable to the willful default or neglect of TAW. The trial court reasoned that as liability rested on the unreasonable or inadequate water service language of the Tariff, and there were "disparate impacts of various levels of water reduction, including none in some instances, the common course of conduct d[id] not produce inadequacy for all class members."

On February 8, 2023, the Appellants filed a post-hearing memorandum in support of class certification. After further briefing and argument, the trial court conducted an additional hearing on September 21, 2023. At that hearing, the court again indicated it would deny certification but allowed the Appellants to appeal the order or propose an amended class definition prior to the entry of a written order. The trial court entered the order denying the initial class action on November 6, 2023.

The trial court specifically noted in its written order that it had not decided the merits question associated with the Water Loss Incident. Rather, the trial court "considered whether the nature and type of evidence presented by [the Appellants] would be sufficient to prove the elements of liability on a classwide basis" consistent with the rigorous analysis required for class certification. The trial court found that the Appellants could not satisfy the requirements of Tennessee Rule of Civil Procedure 23 as "the disparate impact of various levels of water reduction destroys commonality." Further, the trial court reasoned that "[t]he same difficulties that [the Appellants] face in establishing commonality are present for the typicality requirement, as the claims of the class representatives would not be typical of the rest of the class members." As the Appellants "failed to meet their burden to demonstrate commonality, typicality, and adequacy," the trial court denied class certification.

Appellant Trinity Entertainment filed an amended motion for class certification on October 12, 2023. The motion proposed a narrower "Business Class" defined as all business customers in five Chattanooga service zones—Citico, Hill City, Lookout Mountain, St. Elmo, and Elder Mountain—who were required to close, purchase bottled water, or turn away customers during the Water Loss Incident. Specifically, the proposed "Business Class" included:

All businesses who receive water service from Tennessee-American Water Company in the Citico, Hill City, Lookout Mountain, St. Elmo, and Elder Mountain zones and who:

- 4 -

(a) Closed to the public for any length of time during what were, for that business at that time (i.e., September 2019), normal business hours; or

(b) Substituted bottled water at any point in time for any use for which the business's regular practice was to use tap water; or

(c) In the case of businesses that provide lodging to customers, declined a lodging reservation or turned away a prospective lodging customer despite having a vacancy.

The trial court heard arguments concerning the amended motion for "Business Class" certification on January 18, 2024, and again on April 19, 2024.

On June 14, 2024, the trial court entered its final order denying certification of the amended "Business Class" certification. The court found that the Appellants had not met their burden pursuant to Tennessee Rule of Civil Procedure 23.01 to demonstrate ascertainability, numerosity, commonality, typicality, and adequacy of representation. Having concluded that the Rule 23.01 prerequisites were not satisfied, the court pretermitted further analysis of whether the Appellants demonstrated the independent requirements of Rule 23.02(3). The Appellants timely filed a notice of appeal on June 21, 2024, seeking review of the November 6, 2023 and June 14, 2024 orders denying class certification.

## II.    ISSUES PRESENTED

The Appellants raised the following issues on appeal, which we have reordered and restated as follows:

1. Whether the trial court erred in interpreting the terms of the contract between the Appellants and TAW.

2. Even if the trial court's interpretation of the contract was correct, whether the trial court erred in making what amounts to a merits determination that a 49-hour boil water advisory could never amount to a breach of contract.

3. Whether the trial court erred by declining to certify the original class and amended "Business Class" under Tennessee Rule of Civil Procedure 23.

## III.    STANDARD OF REVIEW

This Court has explained the standard of review applicable to class certification questions as follows:

A trial court's decision on class certification is entitled to deference. *See Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 637 (Tenn. 1996). The grant or denial of class certification is discretionary, and the court's decision will stand absent abuse of that discretion. *Id.* (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)). The abuse of discretion standard typically applies when a choice exists in the trial court among several acceptable alternatives. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)). Because the trial court is vested with the responsibility to make that choice, a reviewing court cannot second-guess the lower court's judgment or merely substitute an alternative it finds preferable. *Id.* at 524 (citations omitted). A reviewing court must instead affirm the discretionary decision so long as reasonable legal minds can disagree about its correctness. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000)). The same principles apply here; a trial court's certification decision must stand if reasonable judicial minds can differ about the soundness of its conclusion. *Freeman v. Blue Ridge Paper Prod., Inc.*, 229 S.W.3d 694, 703 (Tenn. Ct. App. 2007) (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). "The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny." *Beecher*, 312 S.W.3d at 524 (citing *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002)).

*Roberts v. McNeill*, No. W2010-01000-COA-R9-CV, 2011 WL 662648, at *3 (Tenn. Ct. App. Feb. 23, 2011).

A trial court's discretion is not unfettered under the abuse of discretion standard because it must consider controlling legal principles and relevant facts when making a discretionary decision. *Beecher*, 312 S.W.3d at 524 (citing *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). An abuse of discretion occurs if a trial court (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous evaluation of the evidence. *Elliott v. Cobb*, 320 S.W.3d 246, 249-50 (Tenn. 2010). A trial court also abuses its discretion if it "strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision." *Beecher*, 312 S.W.3d at 524 (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

When reviewing a lower court's discretionary decision, an appellate court determines "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's

- 6 -

decision was within the range of acceptable alternative dispositions." *Id.* (citing *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008)).

We review a trial court's factual findings *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). A trial court's legal conclusions, however, are reviewed *de novo* with no presumption of correctness. *Beecher*, 312 at 525 (citing *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 212 (Tenn. Ct. App. 2002)).

## IV.    ANALYSIS

Before turning to the issues presented by the parties, we note that Tennessee Rule of Civil Procedure 23 sets forth the requirements for class certification. The proponent of the class certification bears the burden of showing that requirements of Rule 23 have been satisfied. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 307 (Tenn. 2008); *see also In re SmileDirectClub, Inc. Sec. Litig.*, No. M2021-00469-COA-R3-CV, 2022 WL 818950, at *6 (Tenn. Ct. App. Mar. 18, 2022) ("The burden is on the proponent of class certification to demonstrate that a class action is appropriate.") (internal citations omitted). This burden is a two-step process. First, the proponent must demonstrate compliance with each of the following requirements in Rule 23.01:

> (1) [T]he class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

Tenn. R. Civ. P. 23.01.

Second, the proponent must show that the proposed class meets one of the three requirements listed in Rule 23.02, which are as follows:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>
> (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interest; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the question[s] of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.

Tenn. R. Civ. P. 23.02. Trial courts are obligated to determine whether a proposed class meets these requirements "[a]s soon as practicable after the commencement of an action brought as a class action," and "[a]n order under this section . . . may be altered or amended before the decision on the merits." Tenn. R. Civ. P. 23.03(1).

While "[t]here are not many reported opinions from Tennessee Courts analyzing class action certification[,]" *Doe v. City of Memphis*, No. W2023-01222-COA-R3-CV, 2024 WL 4891769, at *4 (Tenn. Ct. App. Nov. 26, 2024), Tennessee courts typically turn to reported opinions from federal courts because the federal rule is "is substantially the same" as Tennessee's rule. *Id.* (quoting *Gov't Emps. Ins. Co. v. Bloodworth*, No. M2003-02986-COA-R10-CV, 2007 WL 1966022, at *2 (Tenn. Ct. App. June 29, 2007) (internal quotations omitted)).

The United States Supreme Court previously emphasized that a trial court must engage in a "rigorous analysis" of the Rule 23 requirements before certifying a class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). Tennessee courts have utilized this same standard. *Rogers v. Adventure House LLC*, 617 S.W.3d 542, 555-56 (Tenn. Ct. App. 2020). As explained in *Rogers*, a trial court's rigorous analysis includes "an evaluation of whether common questions of law or fact predominate over individual questions and whether class action provides the superior method of resolving the claims." *Id.* at 552 (citing *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 528 S.W.3d 524, 552 (Tenn. Ct. App. 2017)). As such, a trial court must "take a 'close look' at the parties' claims and evidence," *Bloodworth*, 2007 WL 1966022, at *6 (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997)). As part of its "rigorous analysis," the trial court must consider what the parties must prove. *Bloodworth*, 2007 WL 1966022, at *22 (citation omitted).

The Appellants argue that the trial court erred by declining to certify the original class and the amended "Business Class." We address each denial of class certification below beginning with the original class.

1.  The Underlying Claim

The Appellants' sole remaining claim was for breach of contract, which was based on an alleged breach of the contractual relationship between TAW and its customers. After reviewing the Tariff and appliable TPUC regulations, the trial court found that to establish breach, the Appellants had to prove two things: (1) that there was an unreasonable interruption of or failure to provide adequate water service to the customer, and (2) that the unreasonable interruption of or failure to provide adequate water service was due to the willful default or neglect of TAW. The Appellants assert that the trial court incorrectly interpreted the governing contract between TAW and its customers. The Appellants further contend that even if the trial court did not err in its interpretation, the trial court erred by effectively deciding the merits of the underlying claim. We address each assignment of error below.

a.  *Contract Interpretation*

The trial court noted that the parties did not dispute that TAW's Tariff, filed with and approved by the TPUC, governs its contractual obligations to customers. The central dispute concerns the scope of that duty—specifically, whether the Tariff guarantees continuous service or whether its obligation is limited to the exercise of reasonable care and diligence. The Appellants argue that the Tariff outlines the contractual basis of service, and under the plain and ordinary meaning of the Tariff, the inquiry should focus on TAW's conduct rather than require a certain degree of impact for each plaintiff. TAW contends that the Tariff imposed a duty to provide reasonably adequate service and expressly disclaims any guarantee of uninterrupted service.

A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (citing *Christenberry v. Tipton,* 160 S.W.3d 487, 494 (Tenn. 2005)); *see also U.S. Bank N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn. 2009) ("Absent fraud or mistake, the terms of a contract should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.") (citing *Christenberry*, 160 S.W.3d at 494). Courts must look at the plain meaning of the words in a contract to determine the parties' intent. *Watson,* 195 S.W.3d at 611. Additionally, the Tennessee Supreme Court previously recognized that the Tariff between TAW and its customers necessarily includes the regulatory obligations promulgated by TPUC. *See White v. Tennessee-American Water Co.*, 603 S.W.2d 140, 142 (Tenn. 1980) ("These regulations obviously bear upon the contractual relationship, express or implied,

between the parties.").

"Tennessee law generally provides that contracts should not be interpreted in ways that render portions meaningless." *Hyatt v. Adenus Grp., LLC*, 656 S.W.3d 349, 373 (Tenn. Ct. App. 2022). If the contractual language is clear and unambiguous, the literal meaning controls; however, if the words are ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Id.* In such circumstances, "the court must apply established rules of construction to determine the intent of the parties." *Id.* (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.,* 78 S.W.3d 885, 890 (Tenn. 2002)); *see also Guiliano v. Cleo, Inc*., 995 S.W.2d 88, 95 (Tenn. 1999) ("All provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract.").

The provisions of the Tariff indicate that TAW's duty is one of reasonable service. Specifically, Section 18.1 states:

> The Company will endeavor to give reasonable Water Service, however, customers are cautioned to provide sufficient storage of water where an absolutely uninterrupted supply at uniform pressure must be assured, such as for steam boilers, hot water systems, gas engines, fire service, etc.

Section 25.1 of the Tariff permits interruptions in service by providing:

> The Company reserves the right at any time to shut off water in the Distribution Mains in case of accident or emergency, or for the purpose of making connections, extensions, improvements, alterations, repairs, changes, or for other proper business or utility reasons.

This is consistent with Section 26.1, which states:

> The Company will undertake to use reasonable care and diligence to prevent and avoid interruptions and fluctuations in Water Service and to maintain reasonable pressure on the distribution system, but it cannot and does not guarantee to furnish at all times any given quantity for fire or general purposes or that interruptions or fluctuations in service will not occur.

The trial court further noted that the Appellants alleged violations of specific TPUC regulations including sections 1220-04-03-.25(1), 1220-04-03-.42(2), and 1220-04-03-.43(1). *See* Tenn. Comp. R. & Regs. § 1220-04-03.25(1) (requiring that the "design and construction of the utility's water plan shall conform to good standard engineering practice" and "shall be designed and operated so as to provide reasonably adequate and safe service to its customers"); *Id.* at § 1220-04-03.42(2) (requiring the utility to "make all

- 10 -

reasonable efforts to prevent interruptions of service"); *Id.* at § 1220-04-03.43(1) (requiring utility to "exercise reasonable diligence to furnish a continuous and adequate supply of water to its customers and to avoid any shortage or interruption of delivery thereof"). As noted in *See White v. Tennessee-American Water Co.*, 603 S.W.2d 140, 142 (Tenn. 1980), the trial court here found that the TPUC regulations are incorporated into and augment TAW's contractual obligations to its customers.

After reviewing TAW's Tariff and TPUC regulations, the trial court made the determination that "[t]hese provisions plainly recognize that customers are not guaranteed continuous service, and that service interruptions and fluctuations may occur without imposing strict liability on [TAW]." The trial court also found that whether an unreasonable interruption or failure to provide adequate service impacted customers required an individual inquiry.

Applying the principles of contract interpretation against the backdrop of the controlling language in the Tariff here, we conclude that the trial court did not err in its interpretation of the contractual obligations owed by TAW. The trial court noted that the operative provision states that TAW "will undertake to use reasonable care and diligence to prevent and avoid interruptions" but the Tariff does not guarantee uninterrupted service. The text plainly establishes a duty of reasonable care rather than an absolute guarantee of continuous service. Construing the Tariff otherwise would nullify the phrase "reasonable care and diligence," and counter TAW's ability to interrupt service for routine repairs, which is contrary to this Court's precedent regarding contract construction. *See, e.g.*, *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) ("All provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract.") (internal citations omitted).

For these reasons, we hold that the trial court's interpretation accords with the plain meaning of the Tariff language, Tennessee precedent, and TPUC's regulatory framework.

### b. Merits Determination

The Appellants argue next on appeal that even if the trial court correctly interpreted the contract between the parties, its decision amounted to an impermissible merits determination. The Appellants contend that the trial court abused its discretion and usurped the role of the fact finder in determining that "a 49-hour BWA was [ ] insufficient to support a class-wide showing of common impact." TAW asserts that the trial court did not resolve the merits but rather conducted the rigorous analysis required for class certification. The trial court observed that while the water main break is undisputed, its impact varied substantially among customers depending on location, duration, and use. The court explicitly stated that it "need not and has not decided at this time the merits questions associated with whether the Leak Event, including whether the precautionary BWA caused

a breach of contract for the class or any particular customer." Our analysis is as follows.

The rigorous analysis required for class certification "will frequently entail overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (internal citations omitted); *see also Bloodworth*, 2007 WL 1966022, at *21-22. "Importantly, 'a court considering class certification need not assume that all well-plead facts are true, but instead must probe behind the pleadings to consider facts in evaluating whether the party moving for certification has met its burden.'" *EMCF*, 2018 WL 6266529, at *5 (citing *Bloodworth*, 2007 WL 1966022, at *19). Tennessee courts require a rigorous inquiry to ensure that a question will generate common answers "apt to drive the resolution of the litigation." *Rogers*, 617 S.W.3d at 563 (quoting *Wal-Mart Stores*, 564 U.S. at 350) (internal quotations omitted).

As the United States Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, "[w]hat matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of classwide proceedings to generate common answers." *Id.* at 350. Accordingly, courts must perform a "rigorous analysis" of these requirements even when that inquiry overlaps with the merits of the plaintiff's underlying claim. *Id.* at 351. When these principles are applied to other class certifications, courts find that individual issues outnumber commons issues, which precludes "the use of 'common answers' to further the case at trial, and barring certification of the proposed class." *Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-CV-00405-GFVT, 2018 WL 1546355, at *7 (E.D. Ky. Mar. 29, 2018) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 349-50).

Here, the trial court's interpretation of the contract did not amount to a determination of the merits but rather reflected adherence to the above principles. It correctly recognized that overlap between the merits and the Rule 23 inquiry was unavoidable. By identifying that each customer's injury, if any, will require individualized proof, the court did not weigh liability evidence but instead found that the claims could not be proven through evidence common to the proposed class. The court applied the correct legal standards and grounded its decision in the record. For example, the trial court analyzed the testimony of Wayne Lorenz, the Appellants' engineering expert, who acknowledged that he "cannot say which customers suffered water interruption and to what extent." Thus, the trial court determined that configuring the specific impact of the Water Loss Incident on a specific customer, including whether the water supply was inadequate, would require an individualized inquiry.

The trial court's conclusion that individual proof is required to establish the breach of contract claim reflects an assessment of class certification requirements rather than a merits adjudication. Further, the trial court's findings did not address the sufficiency of the Appellants' claims. Accordingly, we conclude that the trial court did not impermissibly resolve the merits of the underlying claim.

2. Class Certification

    *a. The Original Class Definition*

As the proponents of class certification, the Appellants bear the burden to define the proposed class with specificity and the court "retains significant authority to redefine, modify, or clarify the class." *Meighan*, 924 S.W. at 637. The Appellants offered two definitions as it pertains to the original class. First, the complaint sought to represent the following class of individuals and businesses:

> All persons and businesses who lost water service provided by Tennessee-American Water Company during the Water Loss Incident, or who suffered monetary losses as the result of not being able to earn wages during the Water Loss Incident.

However, the Appellants' memorandum in support of class certification substituted a second, broader definition:

> [A]ll of TAW's residential and business customers in the Chattanooga Service Area (as shown in the distribution map attached Exhibit 24) at the time of the Water Loss Incident, and all non-customer employees of TAW's business customers in the Chattanooga Service Area who were unable to earn hourly wages during the Water Loss Incident.

The trial court noted that each proposed definition includes TAW customers "with potential service impacts differing widely in type, severity and duration, ranging from complete cessation of water, loss of pressure to varying extents[.]" The trial court considered both class definitions and found that while the class satisfied numerosity, the Appellants failed to satisfy the remaining requirements of Rule 23. The court determined that the differences in the nature and extent of service interruption required individualized inquiry, which destroyed commonality, typicality, and adequacy of representation. Our analysis is as follows.

        i.     Commonality

To satisfy commonality, Rule 23.01(2) requires a "common contention . . . of such a nature that it is capable of classwide resolution." *Wal-Mart Stores*, 564 U.S. at 350. As this Court explained in *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 528 S.W.3d 524 (Tenn. Ct. App. 2017), a class action is most likely to achieve certification when a common course of wrongful conduct is alleged. Specifically,

> [w]here a common course of wrongful conduct is alleged, commonality is

- 13 -

most easily demonstrated. *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988), *see also Newberg on Class Actions*, § 3.10 ("When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more elements of that cause of action will be common to all of the persons affected...."). A common nucleus of facts is usually enough to satisfy the commonality requirement of Rule 23.01(2). *Robinson* [*v. EMI Music Distribution, Inc.*], 1996 WL 495551, at *2 [(Tenn. Cir. Ct. 1996)]. Finally, separate issues of law and fact regarding damages do not negate class action certification. *Meighan*, 924 S.W.2d at 637.

*Wofford*, 528 S.W.3d at 528-29. However, "[w]hat matters to class certification is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers." *Rogers*, 617 S.W.3d at 559 (quoting *Wal-Mart Stores*, 564 U.S. at 350). The "claims must depend upon a common contention," *Wal-Mart Stores*, 564 U.S. at 350, and what matters is the capacity to generate common answers, not merely raising common questions. *Id.*

The district court in *Modern Holdings* applied the above principles and found that individual issues of each plaintiff outnumbered common issues, which "preclud[ed] the use of 'common answers' to further the case at trial, and barr[ed] certification of the proposed class." *Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-CV-00405-GFVT, 2018 WL 1546355, at *7 (E.D. Ky. Mar. 29, 2018) (quoting *Wal-Mart Stores*, 564 U.S. at 349-50). Significantly, the alleged cause of the plaintiffs' injuries consisted of at least twenty-five different substances, such that the court found that "causation of one disease based on the alleged contamination of lead fails to present the same legal question as the causation of a different disease based on contamination of TCE." *Id.* Thus, the *Modern Holdings* court concluded that the plaintiffs had "failed to show their listed common questions [would] elicit common answers leading to classwide relief." *Id.* at *8.

In determining that commonality was not satisfied, the trial court concluded that the "contract language requires evaluation of whether there is unreasonable interruption or inadequate service, and that evaluation requires individual inquiry into the disparate circumstances of the proposed class members[.]" The trial court reached this conclusion relying, in part, on Plaintiff's engineering expert who "testified that his analysis did not identify indications of water loss in five of the nine pressure zones in [TAW's] system." As further indicated by the Appellants' expert, the court would need to determine where a customer lives and interview the customer to determine if they were present during the Water Loss Incident to evaluate the specific impacts to that customer. To emphasize this point, the trial court detailed the proof each named Plaintiff would be required to submit in order to prevail. It concluded that "[r]educed water pressure or volume for one household may not amount to an inadequacy in a single-occupant home, while the same reduction in pressure or volume for a home with five or six family members may constitute an

inadequacy or unreasonable interruption in supply of volume." Further, reductions in water volume or pressure "may force certain businesses to close operations, but that same reduction may not have the same or similar effect on other businesses." In addition to the uncertainty of the Water Loss Incident's effect on businesses, "[w]age earners who lost tips differ substantially from those who were able to keep working, or those who do not receive tips, or those who lost one day of work versus those who lost two or more days."

The trial court determined that the Appellants in the instant action did not establish that a class-wide proceeding will generate common answers "apt to drive the resolution of the litigation." *See Wal-Mart Stores*, 564 U.S. at 350. The Appellants sought certification of a class that consisted of all of TAW's residential and business customers as well as all non-customer employees of TAW's business customers who were unable to earn hourly wages. The trial court's rigorous analysis emphasized that evaluation of whether an unreasonable interruption or inadequate service occurred would require an individualized inquiry into the disparate circumstances of the proposed class members.

This evaluation proved even more difficult when the trial court further parsed the Appellants' proposed class definition. The trial court noted that each of the Appellants' proposed definitions included "wage earners" seeking recovery for monetary loss as a result of not being able to work due to the impact of the Water Loss Incident. As such, these employees would have to establish privity of contract with TAW or that such employees were intended third-party beneficiaries of the contract between TAW and its customers. *See Blackthorn House, LLC v. First Volunteer Bank*, No. E2021-00346-COA-R3-CV, 2022 WL 2679798, at *8 (Tenn. Ct. App. July 12, 2022) (recognizing that "a third party may seek to recover under a contract," but "must first prove, from the terms of the contract or the circumstances surrounding its execution, that, at the time of contracting, the third party was an intended third-party beneficiary of the contract") (internal citations omitted). The Appellants did not offer an argument on appeal to counter the trial court's finding that "the hourly wage earners are subject to the same disparate factors that apply to the class as a whole and preclude class certification[.]" Without any argument to counter the contention that the hourly wage earners are third-party beneficiaries of the contract, we find the trial court's analysis persuasive.

We conclude that the trial court did not abuse its discretion by determining that Plaintiffs failed to satisfy their burden concerning commonality pursuant to Rule 23.01(2). Having determined that the Appellant's proposed class does not meet the commonality requirements of Rule 23.01, we determine that further analysis is pretermitted as moot.

### b. The Amended "Business Class" Definition

Following the denial of the original class certification, Appellant Trinity Entertainment filed an amended motion for class certification to certify a class consisting of:

All businesses who receive water service from Tennessee-American Water Company in the Citico, Hill City, Lookout Mountain, St. Elmo, and Elder Mountain zones and who:

(a) Closed to the public for any length of time during what were, for that business at that time (i.e., September 2019), normal business hours; or

(b) Substituted bottled water at any point in time for any use for which the business's regular practice was to use tap water; or

(c) In the case of businesses that provide lodging to customers, declined a lodging reservation or turned away a prospective lodging customer despite having a vacancy.

The Appellants argued that TAW's business customers were affected by the Water Loss Incident, either through a forced closure, reliance on bottled water, or loss of clientele. TAW opposed the motion, asserting that the Appellants failed to identify the number of qualifying businesses and that the effects of the outage varied widely, even among those within the proposed zones. After a hearing, the trial court again denied certification, finding that Appellants failed to establish ascertainability, numerosity, commonality, typicality, and adequacy of representative. The trial court noted that "[d]efining the class to include only business that took certain actions (closing, buying substitute water, or turning away lodgers) . . . [did] not eliminate the need for individual inquiry[.]" Our analysis is as follows.

### i. Ascertainability

Prior to class certification, the trial court must find that the proposed class definition is ascertainable in that it "must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (citing *Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (explaining that a class definition should be based on objective criteria so that class members may be identified without individualized fact finding)); *See also John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (noting that "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23"); *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188 (6th Cir.1988) (upholding class certification where each class member lived in vicinity of a landfill that was contaminated by defendant); *Freeman*, 229 S.W.3d at 701 (certifying class when class members were landowners abutting or adjacent to a river that was polluted by defendants). In other words, "'[f]or a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference

- 16 -

to objective criteria.'" *Young*, 593 F.3d at 538-39 (quoting *Moore's Federal Practice* § 23.21[3]); *see also DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir. 1970) ("It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable").

Ascertainability under Federal Rule of Civil Procedure 23 focuses on objective criteria:

> In some circumstances, a reference to damages or injuries caused by particular wrongful actions taken by the defendants will be a sufficiently objective criterion for proper inclusion in a class definition. Similarly, a reference to fixed, geographic boundaries will generally be sufficient for proper inclusion in a class definition.

5 James W. Moore et al., *Moore's Federal Practice* § 23.21[3] (3d ed. 1997). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 567 (E.D. Tenn. 2014) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012)).

The Appellants maintain that the amended "Business Class" is defined by objective criteria—businesses located within a geographic boundary most affected by the Water Loss Incident. The Appellants assert that potential class members may be determined by objective reference to TAW's customer records and the map of service that delineates the geographic scope of the "Business Class."

In *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188 (6th Cir.1988), the Sixth Circuit held that the district court did not abuse its discretion in certifying a class in a tort action. *Id.* at 1197. In ruling so, the *Sterling* court commented on certification of mass tort class actions:

> [T]he problem of individualization of issues is often cited as a justification for denying class action treatment in mass tort accidents. While some courts have adopted this justification in refusing to verify such accidents as class actions, numerous other courts have recognized the increasingly insistent need for a more efficient method of disposing of a large number of lawsuits arising out of a single disaster or a single course of conduct. In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next . . . . Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible . . . . In complex, mass, toxic tort accidents, where no one set of operative facts

establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving controversy. However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.

*Id.* at 1196-97. While the Appellants argue that *Sterling* supports certification in this matter, the facts of *Sterling* are distinguishable here. The plaintiffs in *Sterling* lived in the vicinity of the landfill and suffered damages due to operations, and the court noted that "[t]he single major issue distinguishing the class members is the nature and amount of damages . . . each sustained." *Id.* at 1197. Here, the underlying claim is for breach of contract. The "Business Class" would include those who took the following actions: (a) closed to the public for any length of time during what were, for that business at that time (i.e., September 2019), normal business hours; or (b) substituted bottled water at any point in time for any use for which the business's regular practice was to use tap water; or (c) in the case of businesses that provide lodging to customers, declined a lodging reservation or turned away a prospective lodging customer despite having a vacancy. Unlike *Sterling*, where the class boundaries were objectively based on the member's vicinity to the landfill, here the trial court found that "the case would devolve into a case-by-case factfinding mission, and there would be mini-trials of various members defying the purposes of class certification."

The trial court found that the amended "Business Class" was not ascertainable based on objective, identifiable criteria. In reaching this conclusion, the trial court noted that the Appellant Trinity had not provided any common proof "that would allow a determination as to which businesses took the actions necessary to be part of the class." As such, the proposed class definition "would require factfinding or mini-trials to determine class membership, or involve speculation that would be difficult to disprove[.]"

We emphasize that the trial court's decision regarding class certification is entitled to deference by a reviewing court. *Meighan*, 924 S.W.2d at 637. We affirm a trial court's discretionary decision "so long as reasonable minds can disagree about its correctness." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (internal citations omitted). Even though this discretion is not unbounded, we decline to disturb the trial court's decision absent an abuse of discretion, which we do not find here.

Upon review of the record, we conclude that the trial court did not abuse its discretion in finding that the amended "Business Class" was not ascertainable. As we affirm the trial court's denial of the "Business Class" certification, all other issues related to the requisites for certification under Tennessee Rule of Civil Procedure 23 are pretermitted.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are taxed to Appellants, Shaun Christopher Bruce, Bonnie L. Schafer, and Trinity Entertainment, LLC, for which execution may issue if necessary.

s/ Valerie L. Smith
VALERIE L. SMITH, JUDGE